UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| HONORA WIERZBICKI, | * | CIV 11-3021-RAL |
| as the Special Administer of the Estate of | * | |
| Mary Josephine Jones | * | |
| | * | OPINION AND ORDER |
| Plaintiff, | * | DENYING SUMMARY |
| | * | JUDGMENT, PARTIAL |
| vs. | * | SUMMARY JUDGMENT, |
| | * | AND MOTION TO STRIKE |
| THE UNITED STATES OF AMERICA, | * | |
| | * | |
| Defendant. | * | |

Plaintiff Honora Wierzbicki ("Wierzbicki" or "Plaintiff") filed a Complaint, as the Special

Administrator of the Estate of her mother Mary Josephine Jones ("Jones") under the Federal Tort

Claims Act, 28 U.S.C. § 1346, alleging that Defendant United States Government ("the

Government") was negligent in its care for Jones while Jones was a patient at the Indian Health

Services Medical Center at Rosebud, South Dakota. Doc. 1. Wierzbicki alleges that Jones was

not properly supervised, fell while unattended, and sustained a head injury that ultimately led to

her death. Doc. 1. The Government filed a Motion for Summary Judgment, Doc. 12, arguing that

Jones is barred from recovery under the doctrines of assumption of the risk and contributory

negligence or, alternatively, that the Government was not negligent. Wierzbicki opposed the

Government's motion, Doc. 22, and filed her own Motion for Partial Summary Judgment, Doc.

18, arguing that the Government was negligent as a matter of law for failing to observe policies

and procedures to prevent Jones from falling. Accompanying Wierzbicki's final responsive

pleading was an affidavit of Charlotte Sheppard, Wierzbicki's previously disclosed expert. Doc.

34-2. The Government filed a Motion to Strike Affidavit of Charlotte Sheppard, Doc. 36, which

Wierzbicki opposed, Doc. 38.

## I. Facts Not in Genuine Dispute

The Government under Local Rule 56.1 filed a Statement of Undisputed Material Facts along with its Motion for Summary Judgment. Doc. 14. Wierzbicki under Local Rule 56.1 filed Plaintiff's Responses to United States' Statement of Undisputed Material Facts. Doc. 24. Wierzbicki, likewise, under Local Rule 56.1 filed her Statement of Undisputed Material Facts, Doc. 21, along with her Motion for Partial Summary Judgment. The Government then filed United States' Response to Plaintiff's Statement of Undisputed Material Facts. Doc. 27. Wierzbicki also filed a Statement of Material Facts Still in Dispute, Doc. 25, to which the Government replied, Doc. 31. The facts not in genuine dispute primarily are taken from these documents.

### A. Hospital Visit

Wierzbicki is the daughter of Mary Josephine Jones. Doc. 24 at ¶ 2. For the last approximately forty to forty-five years of her life, Jones lived in Rosebud or Mission, South Dakota. Doc. 24 at ¶ 3. Jones, who was 87 years old in 2009, suffered from severe heart problems for which she was taking multiple medications. Doc. 24 at ¶¶ 2, 4. On October 17, 2009, Jones arrived by ambulance at the emergency room at the Indian Health Services Rosebud Comprehensive Health Care Facility ("Rosebud IHS"), which is operated by the Government. Doc. 24 at ¶¶ 1, 7. Jones told the intake nurse that she was dizzy and had fallen four times at her home. Doc. 24 at ¶¶ 8, 22. Dr. John T. Benson, Jones' emergency room physician, felt that Jones' age combined with her medical history—conditions including diabetes, atrial fibrillation, endocarditas, high cholesterol, and high blood pressure—put her health generally at risk. Doc. 24 at ¶ 9. Dr. Benson ordered a battery of tests in an attempt to diagnose the cause of Jones' dizziness. Doc. 24 at ¶¶ 10-14. Ultimately, nothing in the tests indicated any specific acute problems, but Jones was admitted to the hospital because of her dizziness and lack of coordination

while walking. Doc. 24 at ¶¶ 14, 17, 18. The admitting nurse, Ruth Heinert, concluded that Jones was a patient at risk for falls and determined that Rosebud IHS's fall precaution policies would be implemented for Jones' hospitalization. Doc. 24 at ¶ 24; Doc. 27 at ¶ 1.

**B.  The Fall Precaution Policy**

Rosebud IHS has policies specifying certain protections for an admitted patient deemed at a high risk for falls. Although the parties dispute which of two different policies was in effect during Jones' stay in October 2009, see Doc. 24 at ¶ 28-29; Doc. 27 at ¶ 2, the record reveals that this is not a genuine dispute.

In August 2005, Rosebud IHS implemented a fall precaution policy ("the August 2005 Policy").[1] Doc. 24 at ¶ 28. In 2009, Rosebud IHS changed its nursing policies, including its fall precaution policy, from the August 2005 Policy to the policies contained in the nursing procedural textbook Lippenscott's Nursing Procedures ("Lippenscott's"). Doc. 24 at ¶ 29. The Government contends that Rosebud IHS adopted Lippenscott's in May of 2009, to supplant and displace the August 2005 Policy. Doc. 24 at ¶ 29; Doc. 27 at ¶ 2. To support this conclusion, the Government produced two documents: (1) a Rosebud IHS policy memorandum that indicates that in May 2009, Rosebud IHS began directing nurses to consult Lippenscott's "for bedside care, equipment, nursing alerts, complications and documentation," Doc. 28-1; Doc. 27 at ¶ 2; and (2) notes from a May 27, 2009 nursing staff meeting that stated under the "New Business" section that "Procedure Book: Lippenscott's 2009 Procedure Book will be available in the Inpt, OPD, ER units for use as A reference guide." Doc. 28-1; Doc. 27 at ¶ 2. The Government also noted that at Rosebud IHS Director of Nursing Carol King's 2012 deposition she stated that she thought that the new policy

---

[1]Different sources refer to these type of policies alternatively as "fall prevention policies" or "fall precaution policies." This Opinion and Order uses those terms interchangeably.

contained in Lippenscott's would have been in place during Jones' stay. See Doc. 32 at 8; Doc. 28-3 at 8-9. The only evidence Wierzbicki presented to assert that a genuine dispute of material fact exists regarding which policy was in place in October 2009 was King's deposition testimony that she could not remember with certainty exactly when in 2009 the fall prevention policy contained in Lippenscott's replaced the August 2005 Policy. See Doc. 24 at ¶ 29; Doc. 28-3 at 8-9. The fact that King, three years after the fact, could not remember when in 2009 the policy changed does not give rise to a *genuine* dispute of fact. The Government's records establish that the policy change occurred in May 2009, before Jones' hospitalization.

The fall prevention policy in the August 2005 Policy differs from the fall prevention policy articulated in Lippenscott's. The August 2005 Policy as amended in December 2006 required, among other precautions, that a bed alarm be turned on for any patient considered at high risk of falling.[2] Doc. 24 at ¶ 28. A bed alarm is a device that notifies the nurses whenever a patient gets

---

[2] The August 2005 Policy required the following procedures:

> At the time of admission all patients shall have an assessment to determine their risk for falls. With a score of (8) or greater the patient is at risk for falls. See Risk to Fall Assessment section on the Adult Admission Data Base that should be completed by the RN.

> Document on nursing Kardex in the activity section . . . [that] the patient is at risk for falls.

> Plan of Care should include: Potential for Injury (risk for fall) on Care Plan.

> Identify fall prone patients/Risk for fall on the front of their chart(s) with an orange "Fall Precaution" sticker.

> Report to oncoming shift.

> Explain to patient and family or significant other.

out of bed. Doc. 24 at ¶ 53. <u>Lippenscott's</u>, however, does not require bed alarms. Doc. 24 at ¶ 30. <u>Lippenscott's</u> "Preventing falls" section mentions certain techniques that should be employed including safety devices such as call bells, lowered beds with locked wheels, and side rails that are raised. Doc. 24 at ¶ 30. Although <u>Lippenscott's</u> does not require bed alarms as part of its fall precaution policy, it does mention that patients receive "advice on assistive devices" and it references recommendations from the Centers for Disease Control and Prevention for preventing falls in elderly patients that include "the use of technological devices, such as alarm systems, that are activated when patients get out of bed." Doc. 24 at ¶ 31; Doc. 16-7 at 5-6.

Rosebud IHS had bed alarms in October 2009. Doc. 27 at ¶ 3; Doc. 24 at ¶ 32. But these

---

Assign patient to a room near the nursing station that are at risk for falls.

Use safety devices; side rails up (x2) address as mobility, **bed alarm on**, call light within reach, when up in wheelchair, use wheelchair alarm and if put on the commode, fall prone patient <u>should never</u> be left unattended while on commode. Light on at night to assist patient with disorientation.

Assess patient every two (2) hours per shift for bathroom needs.

Educate patient and family on the protocol (to aid in compliance and family understanding) on fall prevention. Document education efforts on the Interdisciplinary/Education record.

In the event of a fall, the nurse will examine and assess the patient and take vital signs. The nurse caring for the patient must fill ouT an incident report giving details of the incident and notify the doctor. This report must be turned into the Hospital Accreditation Specialist, Director of Nursing, and the Safety Officer for Review.

Doc. 16-5 (bold emphasis added).

bed alarms were not working in October 2009, and had not been in working condition for at least a year prior to Jones' stay. Doc. 27 at ¶ 3; Doc. 24 at ¶ 32. Although Rosebud IHS staff had alerted Rosebud IHS management on more than one occasion that the bed alarms were inoperable, the bed alarms remained inoperable in October 2009, so no bed or mobility alarms were used as a fall precaution during Jones' hospitalization. Doc. 27 at ¶¶ 2, 4; Doc. 24 at ¶ 27. Other fall precaution procedures, however, were in place at Rosebud IHS. Jones' bed was placed in its lowest position, she was placed in a room visible from the nurses station, her call light was within her reach, and her bed rails raised. Doc. 24 at ¶¶ 25, 67, 70, 72.

### C. The Fall

On October 19, 2009, Dr. Soon Kim notified Jones that she was to be discharged. Doc. 24 at ¶ 40. Jones was sent to Physical Therapist Amy Reindl to be trained on how to use a walker. Doc. 24 at ¶¶ 40-44. With Reindle, Jones stumbled several times when trying to walk without help and Jones could not maintain her balance while standing. Doc. 24 at ¶¶ 44-45. Jones performed better once she began using a walker. Doc. 24 at ¶ 46. Based on Reindle's assessment, coupled with the fact that Jones lived alone, Jones' discharge was placed on hold so that Social Services could be contacted regarding possible nursing home placement for Jones. Doc. 24 at ¶¶ 47-48, 58.

Wanblee Win Guerue, the Social Services representative at Rosebud IHS in charge of nursing home placement, met with Jones on October 19, 2009, to tell Jones that she would be placed at a White River, South Dakota nursing home on Monday, October 26, 2009. Doc. 24 at ¶¶ 62-64. Guerue recalled that Jones was alert and talkative and that Jones recognized the danger of continuing to live alone with her condition. Doc. 24 at ¶¶ 62-66. Jones reportedly told Guerue that she was afraid to go home because she could kill herself from one of her falls. Doc. 24 at ¶ 63.

On October 20, 2009, physical therapist Reindl observed that Jones' balance had improved and that she could get in and out of bed, move from sitting to standing without trouble, and had no trouble with her mental cognitive functioning. Doc. 24 at ¶¶ 49-53. Jones performed a "toilet transfer" and walked 100 feet using her walker without losing balance. Doc. 24 at ¶ 51. However, because of Jones' continued dizziness, Reindl recommended Jones not get out of bed or use the restroom alone. Doc. 24 at ¶ 51.

On October 21, 2009, Monica Pochop served as Jones' day shift nurse. Doc. 24 at ¶ 60. Nurse Pochop reported that Jones was alert, oriented, and used her call light when she needed to leave her bed. Doc. 24 at ¶¶ 60-61. Nurse Pochop took Jones to the bathroom at 6:00 p.m. on October 21; Jones' gait was steady and Jones felt better and not dizzy at the time. Doc. 24 at ¶ 67.

Nurse Bonnie Wescott oversaw Jones during the overnight shift starting in the evening of October 21 and continuing until the morning of October 22. Doc. 24 at ¶ 69. Wescott described a typical encounter with Jones as follows: Jones would use her call light, Nurse Wescott would go into Jones' room to help her sit up if Jones was not already sitting up, and the pair would walk to the bathroom and then back to Jones' bed where Nurse Wescott would get her settled. Doc. 24 at ¶ 71. At 4:00 a.m. on October 22, Wescott followed this routine to help Jones use the restroom. Jones used her walker, her gait was steady, and she was oriented to person, place, and time. Doc. 24 at ¶ 72; Doc. 16-1 at 28 (noting in the "0400" visit, under "Verbal/Oriented" column Jones was "OX3"). After Jones was settled in her bed, Nurse Wescott put the bed rail up and left the room. Doc. 24 at ¶¶ 72-73. Nurse Wescott then took her break. Doc. 24 at ¶ 73.

Nurse Crystal Shields was sitting at the nurses station on the morning of October 22, 2009. Doc. 24 at ¶ 76. At about 4:10 a.m., after Nurse Wescott left the room and headed out for her break, Nurse Shields heard something that sounded like something had fallen in one of the rooms.

Doc. 24 at ¶¶ 76, 82. Nurse Shields went into Jones' room from which the sound arose and found Jones lying on the bathroom floor. Doc. 24 at ¶ 78. Shields recalled that she did not need to shut off a call light or bed alarm. Doc. 24 at ¶¶ 75-76, 79.

Nurse Wescott returned from her break and assisted Nurse Shields in examining Jones. Jones had some abrasions and a contusion to the left side of her forehead, so the nurses called Dr. Benson, the emergency room doctor on site who had treated Jones earlier in the week. Doc. 24 at ¶¶ 74-81, 83. Dr. Benson noted that Jones was "fairly normal" and stable, knew where she was and what happened, and could indicate where she was feeling pain. Doc. 24 at ¶¶ 84, 86, 88. Jones told Dr. Benson that she remembered standing up, getting dizzy, and falling. Doc. 24 at ¶ 85. Dr. Benson ordered a number of x-rays and a CT scan of Jones' head. Doc. 24 at ¶ 87.

After Jones returned from having x-rays and a CT scan, her condition deteriorated. Doc. 24 at ¶¶ 90-91. She began sweating profusely and was checked into the emergency room at 6:15 a.m., two hours after she had fallen. Doc. 24 at ¶¶ 90-92. Once in the emergency room, her condition continued to worsen. She was in severe distress and became lethargic and then comatose. Doc. 24 at ¶¶ 91-92. The results of the CT scan came back at this point and showed that Jones was bleeding in her brain. Doc. 24 at ¶ 94. Because Jones was taking a prescription blood thinner, the bleeding in her brain occurred at a higher rate than normal, which exacerbated her subdural hematoma. Doc. 25 at ¶ 96. Dr. Benson called a neurosurgeon in Sioux Falls, South Dakota, by that point having done all that could be done for Jones at Rosebud IHS. Doc. 24 at ¶¶ 94-96. At 9:12 a.m., on October 22, 2012, Jones was transferred to Sanford Hospital in Sioux Falls. Doc. 24 at ¶ 97. Jones passed away the next day, October 23, 2009, at Sanford Hospital as a result of the subdural hematoma she sustained in her fall. Doc. 24 at ¶ 98.

**D. Procedural Facts**

Wierzbicki, as special administer of Jones' estate, filed this Complaint on October 3, 2011. Doc. 1. This Court issued an Amended Rule 16 Scheduling Order, ordering that the "identity of and reports from retained experts under Rule 26(a)(2) of the Federal Rules of Civil Procedure shall be due from Plaintiff by August 13, 2012." Doc. 11. The Amended Scheduling Order required that the expert reports comply with Rule 26 and contain "[a] complete statement of all opinions to be expressed and the basis and reasons therefore" and "[t]he data or other information considered by the witness in forming the opinions." Doc. 11.

Wierzbicki designated Charlotte Sheppard as her expert witness and disclosed her report to the Government on August 13, 2012. Doc. 38-1; Doc. 38-2. Sheppard's initial expert report was a two-page letter and was very terse and conclusory in asserting that nursing staff and management at Rosebud IHS allegedly breached the standard of care. Doc. 19-8; Doc. 38-3. The Government within a week of receiving Sheppard's letter advised Wierzbicki's counsel that the disclosure was incomplete under Rule 26(a)(2)(B). Doc. 38-2. Wierzbicki then provided some additional biographical information about Sheppard, but did not augment the disclosure of Sheppard's opinion at that point. The Government chose neither to depose nor to retain an outside expert of its own to testify regarding the standard of care. See Doc. 38-1. The Government points to Physical Therapist Amy Reindl's testimony that bed alarms were helpful for patients with cognitive problems, that Jones did not have any cognitive issues, and thus that a bed alarm would not have been helpful in Jones' care. Doc. 24 at ¶ 53.

Sheppard reviewed records relating to Jones' Rosebud IHS and Sanford Hospital admissions and stays. Doc. 19-8; Doc. 38-3. Sheppard listed her educational and vocational background regarding her expertise in nursing and geriatric care. Doc. 19-8; Doc. 38-3. Sheppard then wrote in her letter report that she "is familiar with the standards of practice across the United

9

States" and "[b]ased upon my review of the records, it is my opinion that the nursing and support staff and management of Rosebud Hospital failed to meet the standard of care in their care and treatment of Mary Jo Jones." Doc. 19-8; Doc. 38-3. At the close of her letter report, Sheppard provided a summation of her opinion:

> The nursing and support staff at Rosebud Hospital failed to meet Ms. Jones' basic needs. Ms. Jones was at high risk for falls yet the nursing staff failed to implement the necessary measures to maintain her safety and avoid foreseeable fall and injury. Specifically the nursing and support staff failed to provide an adequate and appropriate fall management plan including increased supervision and use of assistive/monitoring devices. The facilities [sic] failures resulted in indignities including a fall with subsequent subdural hematoma and her untimely death.

Doc. 19-8; Doc. 38-3.

The Government moved for summary judgment on multiple theories, one of which being that Rosebud IHS met the requisite standard of care. The Government argued as follows:

> Plaintiff has not established an industry standard that mandates the use of bed alarms as a mandatory fall precaution measure which must be implemented in hospital settings for patients who are at risk of falling. Plaintiff's nursing expert sites [sic] to no national guidelines, nursing guidelines, texts, or even one study that supports the argument that the use of bed alarms will prevent falls in a hospital setting. Instead, plaintiff based her claim of negligence upon an internal hospital policy that was not in effect at the time Jones fell.

Doc. 29 at 6. Wierzbicki, in opposing summary judgment, then filed an affidavit from Sheppard that was attached to the last responsive pleading on the Government's summary judgment motion, which was filed almost five months after the expert witness disclosure deadline. Doc. 34-2. Sheppard's affidavit and accompanying curriculum vitae contain much of the same information as Sheppard's letter report and related disclosure of biographical information. Sheppard's affidavit, however, contained new information and sources regarding the basis for her opinion. The

new information contained in the affidavit included the following:

> 5. As part of my evaluation of Ms. Jones' case, I have reviewed the "2009 Joint Commission Hospital National Patient Safety Goals". Goal #9 was to "reduce the risk of patient harm resulting from falls". The Patient Safety Goals specifically noted that the rationale for this goal was because: "Falls account for a significant portion of injuries in hospitalized patients, long term care residents and home care recipients. In the context of the population it serves, the service it provides and its environment of care, the organization should evaluate the patient's risk for falls and take action to reduce the risk of falling as well as risk of injury, should a fall occur. The evaluation could include a patient's fall history, review of medication and alcohol consumption, gait and balance screening, assessment of walking aids, assistive technologies, and protective devices and environmental assessments".

>> 6. Elements of Performance for the "2009 Joint Commission Hospital National Patient Safety Goals - #9" required the following:

>> 1. The hospital establish a fall reduction program.

>> 2. The fall reduction program includes an evaluation appropriate to the patient population, settings and services provided.

>> 3. The fall reduction program includes interventions to reduce the patient's fall risk factors.

>> 4. Staff receives education and training for the fall reduction program.

>> 5. The hospital educates the patient, and their family as needed, on the fall reduction program and any individualized fall reduction program.

>> 6. The hospital evaluates the fall reduction program to determine the effectiveness of the program.

Doc. 34-2. It is this information the Government has moved to strike. Doc. 36.

## II. Discussion

Both parties have moved for summary judgment. The Government argues that (1) Jones'

conduct constitutes assumption of the risk as a matter of law and bars Wierzbicki's recovery regardless of any negligence on the part of the Government; (2) the Government was not negligent because it did not breach its duty of care owed to Jones; and (3) even if the Government were negligent, Jones is barred from recovery because of her level of contributory negligence. Doc. 12; Doc. 13. Wierzbicki moved for partial summary judgment arguing that the care provided by the Government to Jones was negligent because the Government failed to observe its own or national standards of care and that the lack of care was the cause of the fall and, in turn, Jones' death. Doc. 18; Doc. 19.

### A. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). On summary judgment, courts view "the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." E.E.O.C. v. CRST Van Expedited, Inc., 679 F.3d 657, 686 (8th Cir. 2012) (quoting Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011)). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012).

### B. Choice of Law

Wierzbicki brings this negligence action against the Government under the Federal Tort

Claims Act (FTCA), 28 U.S.C. § 1346. The FTCA waives the Government's sovereign immunity protection and gives federal district courts jurisdiction over FTCA suits, for claims

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C § 1346(b)(1). When the FTCA action arises at an Indian Health Services facility within the territory of an American Indian Reservation, this Court must apply the substantive law of the state in which the reservation is located. See LaFromboise v. Leavitt, 439 F.3d 792, 796 (8th Cir. 2006). Rosebud IHS is located in the state of South Dakota. Therefore, the substantive law of the state of South Dakota governs this action.

### C. Government's Motion

#### 1. Assumption of the Risk

The Government argues that it is entitled to summary judgment because Jones' conduct constituted assumption of the risk as a matter of law. Doc. 13. In South Dakota, assumption of the risk is an affirmative defense to a negligence action. Dodson v. S.D. Dept. of Human Servs., 2005 S.D. 91, ¶ 4, 703 N.W.2d 353, 355. A person assumes the risk of injury when that person "(1) had actual or constructive knowledge of the risk; (2) appreciated its character; and (3) voluntarily accepted the risk, with the time, knowledge, and experience to make an intelligent choice." Ray v. Downes, 1998 S.D. 40, ¶ 11, 576 N.W.2d 896, 898. Under the first prong, a person is considered to appreciate the risk "if it is the type of risk that no adult of average intelligence can deny." Duda v. Phatty McGees, Inc., 2008 S.D. 115, ¶ 13, 758 N.W.2d 754, 758 (internal quotation marks omitted). Questions of assumption of the risk and contributory

negligence under South Dakota law "are for the jury in all but the rarest of cases." Stone v. Von Eye Farms, 2007 S.D. 115, ¶ 6, 741 N.W.2d 767, 770.

The Government contends that Jones had knowledge of the risk that walking while unaccompanied carried, knew that she could die from that risk, and voluntarily accepted that risk. Wierzbicki argues that assumption of the risk is not a valid defense because Jones did not know about, appreciate the risk of, and voluntarily accept the Government's negligent failure to use proper fall precaution procedures, specifically the negligent failure to use a bed alarm to ensure that nurses would be notified should Jones attempt to walk alone.

"[A]lthough one may assume the risk of the negligence of another if he is fully informed of such negligence, one is not, under the doctrine of assumption of risk, bound to anticipate the negligent conduct of others." Ray, 1998 S.D. 40, ¶ 14, 576 N.W.2d at 900 (quoting Garcia v. South Tucson, 640 P.2d 1117, 1121 (Ariz. Ct. App.1981), rev'd on other grounds, Garcia v. South Tucson, 663 P.2d 596 (Ariz. Ct. App. 1983)). In Ray, the Supreme Court of South Dakota discussed when assumption of the risk, rather than comparative negligence principles, applies:

> It is here that there is the greatest misapprehension and confusion as to assumption of risk, and its most frequent misapplication. It is not true that in any case where the plaintiff voluntarily encounters a known danger he necessarily consents to any future negligence of the defendant. A pedestrian who walks across the street in the middle of a block, through a stream of traffic traveling at excessive speed, cannot by any stretch of the imagination be found to consent that the drivers shall not use care to watch for him and avoid running him down. On the contrary, he is insisting that they shall. This is contributory negligence pure and simple; it is not assumption of the risk. And if A leaves an automobile stopped at night on the traveled portion of the highway, and his passenger remains sitting in it, it can readily be found that there is consent to the prior negligence of A, whose control over the risk has terminated, but not to the subsequent negligence of B, who thereafter runs into the car from the rear.

Ray, 1998 S.D. 40, ¶ 13, 576 N.W.2d at 899-900 (quoting W. Page Keeton, et al., Prosser & Keeton on Torts § 68 (5th ed. 1984)).   Cases in South Dakota suggest that a defendant is not entitled to summary judgment on an assumption of the risk defense in situations where the plaintiff engages in arguably dangerous behavior, but where the defendant's negligence exacerbated or caused the harm and the plaintiff did not assume the risk that the defendant would act negligently. See id. 1998 S.D. 40, ¶¶ 14-15, 576 N.W.2d at 900 (holding summary judgment not warranted under assumption of the risk when plaintiff places himself in a dangerous position behind a reversing truck, but when the defendant's alleged negligent failure to stop the truck caused the injury); Wilson v. O'Gorman High Sch., No. 05-4158, 2008 WL 2571833, at *5 (D.S.D. June 26, 2008) (holding summary judgment not warranted under assumption of the risk because the plaintiff-gymnast, who fell during a difficult maneuver, did not assume the risk as a matter of law that her coach would act negligently and place her in a situation of enhanced danger).

     Under Wierzbicki's theory of the case, the issue for assumption of the risk purposes is not whether Jones acted negligently by walking alone, but whether Jones had knowledge of the Government's alleged negligent failure to employ bed alarms and thereafter assumed the risk associated with the absence of a bed alarm.  Taking the facts in the light most favorable to Jones, the non-moving party on this issue, whether Jones knowingly assumed the risk of the Government's alleged negligent failure to employ bed alarms is disputed and material.  Like in Ray, Jones' possible awareness of danger from walking alone should not be construed as consent by Jones to relieve Rosebud IHS of its duty of care, which, according to Wierzbicki's theory of the case, included using bed alarms to ensure prompt notification when fall risk patients attempt to walk unaccompanied by staff.  See Ray, 1998 S.D. 40, ¶ 14, 576 N.W.2d at 900.  This is not one of "the rarest of cases" where assumption of the risk exists as a matter of law.  Stone, 2007 S.D.

115, ¶ 6, 741 N.W.2d at 770.

## 2. The Standard of Care

The Government next argues that summary judgment is warranted because the fall precaution procedures implemented by Rosebud IHS met the applicable standard of care. Doc. 13 at 30. "The standard of care to which a hospital must comply is to provide that care which is available at hospitals within the same or similar communities." Wuest v. McKennan Hosp., 2000 S.D. 151, ¶ 23, 619 N.W.2d 682, 689 (citing Shamburger v. Behrens, 418 N.W.2d 299, 306 (S.D. 1988)); see also Koeniguer v. Eckrich, 422 N.W.2d 600, 602 (S.D. 1988) (noting that the standard of care hospitals are measured against is the care available in same or similar communities). In malpractice actions against hospitals based on negligence by the nursing staff, the relevant inquiry is whether the nurses provided reasonable care and exercised professional judgment under the circumstances. Koeniguer, 422 N.W.2d at 602. Individual internal hospital policies are not determinative of the standard of care required. Wuest, 2000 S.D. 151, ¶ 23, 619 N.W.2d at 689. In South Dakota, the standard of care typically must be established through expert testimony. Koeniguer, 422 N.W.2d at 602.

Rosebud IHS had adopted Lippenscott's to displace the August 2005 Policy before Jones' stay, and Lippenscott's does not require bed alarms. Lippenscott's, however, does reference recommendations from the Centers for Disease Control and Prevention which in turn recommends the use of "technological devices, such as alarm systems, that are activated when patients get out of bed." Doc. 24 at ¶ 31; Doc. 16-7 at 5-6. Lippenscott's also states under the "Special considerations" section that hospitals should

> [d]evise an alternative to restraints for a high-risk patient. For example, consider using a device such as a pressure-pad alarm for chairs and beds. The pressure sensor pad lies under the bed linens

> or the chair pad. The reduced pressure that results as the patient
> gets out of bed triggers an alarm at the nurses station.

Doc. 16-7 at 8. Thus, a question of material fact exists as to whether the standard of care requires the use of a bed alarm. Wierzbicki's expert Charlotte Sheppard stated that based on her expertise and training, knowledge of national standards, and review of Jones' records, it was a breach of the standard of care to not employ a monitoring device such as a bed alarm. The Government has not disclosed any expert, but relies on its own employee to maintain that a bed alarm would not be appropriate for a patient like Jones who did not have cognitive problems. Taking the facts, inferences, and expert testimony in the light most favorable to Wierzbicki, whether the standard of care required bed alarms is genuinely in dispute, and summary judgment is not proper.

### 3. Contributory Negligence

The Government argues that Jones was contributorily negligent such that Wierzbicki's recovery is barred. Contributory negligence can be an affirmative defense in professional negligence actions. Dodson, 2005 S.D. 91, ¶¶ 3, 8, 703 N.W.2d at 355-56. "'Contributory negligence is negligence on the part of a plaintiff which, when combined with the negligence of a defendant, contributes as a legal cause in the bringing about of the injury to the plaintiff.'" Steffen v. Schwan's Sales Enters., Inc., 2006 S.D. 41, ¶ 12, 713 N.W.2d 614, 619 (quoting S.D. Pattern Jury Instruction 11-01). A plaintiff who is contributorily negligent may still recover under South Dakota law if her contributory negligence was only slight or was less than slight when compared to the negligence of the defendant. S.D. Codified Laws § 20-9-2; Owen v. United States, 645 F. Supp. 2d 806, 827 (D.S.D. 2009). Contributory negligence is typically an issue for the jury. Stone, 2007 S.D. 115, ¶ 6, 741 N.W.2d at 770.

Summary judgment is not warranted under a contributory negligence theory. Taking facts

in the light most favorable to Wierzbicki, a fact finder might conclude that Jones was not negligent or only slightly negligent when she decided to walk to the bathroom without assistance. Although Jones seemingly put herself in some degree of danger by walking alone, it is not clear how dangerous this activity was considering that she had walked to the bathroom without incident a number of other times in the days prior to the fall and recently had told a nurse that she was feeling better and not as dizzy.

### D. Wierzbicki's Motion for Partial Summary Judgment

Wierzbicki moved for partial summary judgment arguing that the Government was negligent because it breached both its own procedures and national standards of care for fall precautions. Doc. 18. The Government argues summary judgment is not proper because Wierzbicki has not shown as a matter of law that the hospital violated the standard of care outlined in either its own policy or national standards. Doc. 33.

Wierzbicki is not entitled to summary judgment that the Government was negligent for violating the August 2005 Policy. As outlined above, see supra Part III.C.2, the requisite standard of care is not determined by internal hospital policy, but is the standard "available at hospitals within the same or similar communities." Wuest, 2000 S.D. 151, ¶ 23, 619 N.W.2d at 689. In addition, the August 2005 Policy was no longer in effect at Rosebud IHS when Jones fell in October of 2009. Taking facts and inferences in favor of the Government as the non-movant on this issue, there is a dispute over whether the standard of care would require bed alarms, whether the numerous other precautions Rosebud IHS staff took were sufficient to satisfy the standard of care, whether the existence of a bed alarm would even be appropriate for a patient in Jones' cognitive state, and whether a functioning bed alarm would have prevented Jones' fall. Therefore, summary judgment for Plaintiff is not warranted.

**E. The Government's Motion to Strike**

The Government is not seeking to exclude Sheppard from testifying, but seeks to limit her testimony to the information contained in her initial letter report. Doc. 39 at 5. The Government wishes to exclude information in Sheppard's affidavit including that Sheppard consulted the 2009 Joint Commission Hospital National Patient Safety Goals ("Joint Commission Goals") in formulating her opinions.

Rule 26 of the Federal Rules of Civil Procedure requires that a party disclose the identity of expert witnesses and furnish a written report by that witness. Fed. R. Civ. P. 26(a)(1). The report must contain, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B). This Court incorporated those provisions in the Rule 16 Amended Scheduling Order in this case and set an August 13, 2012 deadline for Wierzbicki's expert witness disclosure. Doc. 11.

The Government argues that Sheppard's affidavit is an untimely expert disclosure because it was submitted nearly five months after Wierzbicki's deadline for expert disclosures and after the deadline for discovery had run, and because it was attached to the last responsive pleading to be filed by either party. Wierzbicki argues that Sheppard's affidavit is not late because it is a supplement to her letter report and that this Court's scheduling order allows supplementation of reports until twenty days prior to trial. See Doc. 11. In reality, Sheppard's letter report was somewhat conclusory and vague, and her affidavit was an explanation of the substance of the opinion she previously expressed, which was prompted by the Government's summary judgment motion.

Sheppard's affidavit was not in the nature of a supplement. "Rule 26(e) 'permits

supplemental reports only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report.'" United States v. Black Hills Power, Inc., No. 03-5020-KES, 2006 WL 6908315, at *8 (D.S.D. June 12, 2006) (quoting Minebea Co., Ltd. v. Papst, 231 F.R.D. 3, 6 (D.D.C. 2005)). Wierzbicki did not entitle the affidavit a supplemental report, and the timing, content, and submission of the affidavit is different than a typical supplemental report. In addition, Wierzbicki filed the affidavit as an exhibit attached to a pleading, despite this Court's Scheduling Order directing that "[d]isclosures and reports under Rule 26(a)(2) are not filed with the Clerk." Doc. 11. Wierzbicki admits that the affidavit was created and filed to rebut arguments that the letter report did not delineate the national standard of care for patients prone to falling. See Doc. 37. The Sheppard affidavit does not correct an inaccuracy in the initial report, and the Joint Commission Goals were available to Sheppard when she did her two page letter report. Thus, the affidavit is not truly a supplemental report.

The Government argues that the affidavit should be stricken and that Sheppard should be confined to testify only to the information contained in her initial letter report. The relief sought by the Government is an option potentially within this Court's discretion. "The district court may exclude the information or testimony as a self-executing sanction unless the party's failure to comply is substantially justified or harmless." Wegener v. Johnson, 527 F.3d 687, 692 (8th Cir. 2008). The Eighth Circuit in Wegener, outlined the factors a district court should consider when determining whether to exclude untimely information:

> When a party fails to provide information or identify a witness in compliance with Rule 26(a) or (e), the district court has wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case . . . When fashioning a remedy, the district court should consider, *inter alia*, the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would

20

> disrupt the order and efficiency of the trial, and the importance of
> the information or testimony. . . . We note, however, that the
> district court's discretion narrows as the severity of the sanction or
> remedy it elects increases.

Id. (internal citations omitted).

In this case, Sheppard was timely disclosed as an expert witness. Although terse and conclusory, her letter report disclosed that Sheppard was "familiar with the standards and practices across the United States" for nursing case of patients prone to falls. Doc. 19-8; Doc. 38-3. Sheppard's letter report also opined that Rosebud IHS "failed to provide an adequate and appropriate fall management plan including increased supervision and use of assistive/monitoring devices." Doc. 19-8; Doc. 38-3. The letter report should have, but did not, mention the Joint Commission Goals, which Sheppard raised in her affidavit as part of her evaluation of Rosebud IHS's breach of the standard of care. See Doc. 34-2. Allowing Sheppard to testify about those safety goals, however, does not appear to substantially prejudice the Government. As the Government noted in its brief, the standards in the Joint Commission Goals do not directly rebut the Government's allegations that Wierzbicki's expert produced no standards that require bed alarms because the Joint Commission Goals does not require bed alarms. Doc. 39 at 4. Lippenscott's fall prevention procedures are largely consistent with those outlined in the Joint Commission Goals.

Because no trial date has been set, any disruption in this Court's calendar or this litigation by the Sheppard affidavit elaborating on her opinions is slight. Although the late filing appears largely harmless, any perceived prejudice can be remedied by reopening discovery for the limited purpose of allowing the Government to depose Sheppard and designate its own expert if the Government wishes to do so. The "harsh penalty" of exclusion is not warranted. Wegener, 527

F.3d at 692 (quoting ELCA Enters., Inc. v. Sisco Equip. Rental & Sales, Inc., 53 F.3d 186, 190 (8th Cir. 1995)).

**III. Conclusion**

For the reasons explained in this Opinion and Order, it is hereby

ORDERED that Defendant's Motion for Summary Judgment, Doc. 12, is denied. It is further

ORDERED that Plaintiff's Motion for Partial Summary Judgment, Doc. 18, is denied. It is further

ORDERED that Defendant's Motion to Strike Exhibit 10, Doc. 36, is denied. It is further

ORDERED that Defendant has until June 10, 2013, to depose Plaintiff's expert and to disclose any expert witness on the standard of care if the Government wishes to do so. If the Government discloses an expert witness on the standard of care, Plaintiff shall have until August 1, 2013, to depose that expert if Plaintiff wishes to do so. It is further

ORDERED that a status conference is set for Monday, August 12, 2013, at 8:30 a.m. to discuss setting a trial date and pretrial disclosure deadlines, at which counsel may appear by telephone if they so choose.

Dated April 29th, 2013.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE