FILED
JUL 15 2014

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| HONORA WIERZBICKI, | * | CIV 11-3021-RAL |
| as the Special Administrator of the Estate | * | |
| of Mary Josephine Jones, | * | |
| | * | |
| Plaintiff, | * | FINDINGS OF FACT AND |
| | * | CONCLUSIONS OF LAW |
| vs. | * | |
| | * | |
| THE UNITED STATES OF AMERICA, | * | |
| | * | |
| Defendant. | * | |

From June 2 until June 4, 2014, this Court conducted a court trial of this case. Under Rule 52 of the Federal Rules of Civil Procedure, this Court now enters these Findings of Fact and Conclusions of Law.

## I.      Findings of Fact

### A.      The Parties and the Claims

Plaintiff Honora Wierzbicki (Wierzbicki) is the special administrator of the estate of her mother Mary Josephine Jones (Mary). Mary died on October 23, 2009, as the result of a head injury sustained when she fell at the Indian Health Services Medical Center at Rosebud, South Dakota (Rosebud IHS). Trial Ex. 31: Trial Ex. 49. Rosebud IHS is an agency of the United States government. Accordingly, Wierzbicki brings her claim under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346.

Wierzbicki on July 7, 2010, submitted a claim for damage, injury, or death to Indian Health Services relating to Mary's death. Trial Ex. 51. In the "Basis of Claim" section, Wierzbicki alleged that

> Mary got out of bed to use the bathroom, the call button was at
> Mary's fingertips and in all likelihood she pressed the button and
> waited until she couldn't wait any longer and then attempted to
> make the trip to the bathroom alone. During this fatal trip to the

> bathroom, Mary fell and hit her head on the commode. On the
> night Mary fell, her bed rails were left down, no one answered her
> call light in a timely manner, and she was allowed to move from
> her bed unassisted. The fall prevention measures set up for Mary
> failed, leading to her fatal fall.

Trial Ex. 51. Some of this same language appears in the allegations of Wierzbicki's Complaint although the Complaint alleges negligence more generally on the part of Rosebud IHS nursing staff. See Doc. 1 at ¶¶ 8-9.

The Government contends that it was not negligent and asserts that Wierzbicki is barred from recovery because Mary was contributorily negligent or, alternatively, assumed the risk of injury. Doc. 5; Doc. 63. The Government also contests the damage claims made by Wierzbicki. Doc. 5; Doc. 63.

### B. Mary's Hospitalization at Rosebud IHS

Mary was born on October 4, 1922, and thus was 87 years old during the time of the hospitalization at question. Trial Ex. 55; Trial Ex. 101 at 18. On the evening of October 17, 2009, Mary went to the emergency room of Rosebud IHS reporting that she had been dizzy and nauseated for three days and that she had fallen four times at home that day. Trial Ex. 101 at 9-10, 50. Mary had a long history of heart problems and was on multiple medications, some of which had possible side effects of causing dizziness. See Trial Ex. 110 at 3-4, 50; Trial Ex. 118. Emergency room physician John T. Benson evaluated Mary, observed that she was dizzy and unsteady upon standing, ordered certain tests, could not determine the exact cause of the dizziness, and chose to admit Mary to the Rosebud IHS for evaluation of her condition. Trial Ex. 101 at 7-9.

Ruth Heinert (Heinert) was the nurse at Rosebud IHS who completed the admission form with Mary and who cared for Mary during the night shift of October 17 and 18, 2009. Trial Ex. 101 at 50-51. Nurse Heinert was relatively new as a nurse, having received her registered nursing

degree in 2008 and having joined Rosebud IHS in June of 2009. Nurse Heinert recorded that Mary had "acute dizziness and atoxic gait." Trial Ex. 101 at 9. Nurse Heinert recorded that Mary had been dizzy and nauseated for three days, had fallen four times at home, had an unsteady gait, had bumps from prior falls, and appeared to have slurred speech at times. Trial Ex. 101 at 9-12, 50. Nurse Heinert completed a form that assessed Mary as "At Risk" for falls, noted Mary to be an "Actual Risk of Injury" as part of her nursing diagnosis, and initiated "Fall Prevention/Monitoring." Trial Ex. 101 at 9, 13. The fall prevention measures included having Mary's hospital bed in the lowest position, having the bed wheels locked, instructing Mary on use of her call light, having the call light signal within her reach, instituting use of a bedside commode, and placement of Mary in Room 144. Room 144 is located close to the nurses' station and is one of the two patient rooms in the medical and surgical wing where a person sitting at the nurses' station can see a patient's torso in the hospital bed within the patient room. No physician placed Mary on one-to-one nursing care. Mary was not suffering from dementia and was not a suicide risk, where some form of physical restraint might be appropriately considered.

At the time of Mary's hospitalization, Rosebud IHS had adopted Lippincott's Nursing Procedures (5th Edition) to replace certain other nursing policies. Trial Ex. 103; Trial Ex. 104. Among the policies replaced through adoption of Lippincott's Nursing Procedures was a fall precaution policy from August of 2005 that was last revised in December of 2006 (August of 2005 Policy). Trial Ex. 64. Under the August of 2005 Policy, Rosebud IHS was to use bed alarms as a fall precaution and to employ a formal scoring system in assessing whether patients were fall risks. Trial Ex. 64. Rosebud IHS in fact had bed alarms at the time of Mary's hospitalization in October of 2009, but the bed alarms were not working in October of 2009 and had not been working since at least 2008. Rosebud IHS had another policy in place at the time "to assure that

3

all clinical alarms and medical equipment alarm systems utilized for patient care are properly operational . . . ." Trial Ex. 61 at 72-73. Because the bed alarms were not operational in October of 2009, they were not utilized for patient care during Mary's hospitalization. Nursing staff were aware that the bed alarms did not work and at least one of the nurses had complained to Rosebud IHS management about the non-functioning bed alarms. Remarkably, the director of nursing at Rosebud IHS at the time was unaware in October of 2009 that the bed alarms had stopped working.

Lippincott's Nursing Procedures, the policy in effect at Rosebud IHS during Mary's hospitalization, did not require bed alarms as a part of the "Fall Prevention and Management" procedures. See Trial Ex. 103 at 63-68. However, Lippincott's Nursing Procedures references recommendations from the Center for Disease Control and Prevention for preventing falls in elderly patients including the use of "technological devices, such as alarm systems, that are activated when patients get out of bed." Trial Ex. 103 at 64. Lippincott's Nursing Procedures also sets forth the Morse Fall Scale, a formal scoring system, as "one method" of assessing a patient's likelihood of falling. Trial Ex. 103 at 64. Rosebud IHS did not use the Morse Fall Scale in evaluating Mary as being "At Risk;" if the Morse Fall Scale had been used, Mary would have scored as a "high risk of falling." Although Wierzbicki makes much of the failure to use the Morse Fall Scale or the scoring under the previous August of 2005 Policy, and likewise makes much of the failure of formal reassessment under such a scoring methodology, nursing staff at Rosebud IHS clearly identified Mary upon her admission as being "At Risk" for falling and an "Actual Risk of Injury," informally reassessed her frequently, and never viewed her as anything other than remaining "At Risk" for falling throughout her hospitalization. Trial Ex. 101 at 9-13.

At the time of her admission, Mary was "oriented times three," meaning she was oriented

to person, place, and time. Trial Ex. 101 at 58 (noting that the patient was "Ox3"). Mary received instruction on the use of the call light and verbalized to Nurse Heinert an understanding that she needed to use the call light for assistance. Mary initially was on a telemetry system with an intravenous (IV) drip.

Nurse Bonnie Westcott (Westcott) was responsible for Mary's nursing care during the day shift of October 18, 2009. Nurse Westcott was aware that Mary was on the fall precautions. See Trial Ex. 101 at 51. Mary was able to use the call light and did not demonstrate behavior that made Nurse Westcott concerned for Mary's mental state during the October 18 day shift. See Trial Ex. 101 at 51, 60-61.

Nurse Heinert worked the night shift of October 18 and 19, 2009, during which she provided nursing care to Mary. Mary reported that she was feeling better, but still was dizzy. Trial Ex. 101 at 51. Mary remained on telemetry with use of the bedside commode. Trial Ex. 101 at 51-52. Fall precautions remained in place. Trial Ex. 101 at 51-52. During the night, Mary became confused and was not oriented to time or place, but Nurse Heinert reoriented Mary. Trial Ex. 101 at 51, 60. At other times during the night, Mary was oriented only to person and place, although lack of orientation to time is not uncommon for elderly patients in the middle of the night. At one point in the night, Mary was sitting at her bedside, which concerned Nurse Heinert and prompted Nurse Heinert to reenforce the need for Mary to remain in bed and to call for assistance to get up. Trial Ex. 101 at 52.

During the day of October 19, 2009, physical therapist Amy Reindl (Reindl) visited Mary to assess her. Reindl had provided past care to Mary for other conditions. Reindl used a gait belt to walk with Mary. Reindl noticed that Mary was unstable while walking. Trial Ex. 101 at 52. Mary did better when Reindl introduced a front-wheel walker and indeed was able to walk one-

hundred feet with the walker. Trial Ex. 101 at 52. During Reindl's assessment, Mary verbalized that she knew herself to be a risk of falling. Trial Ex. 101 at 52. Reindl recommended that Mary remain in the hospital. Trial Ex. 101 at 52.

During the night shift of October 19 and 20, 2009, Theresa Kelley (Kelley) provided nursing care to Mary. Mary remained on telemetry with the use of a bedside commode at the time. Nurse Kelley knew that Mary was a fall risk at the time she took over the care for Mary. Mary did not have family staying with her; her daughter Wierzbicki[1] lived in California and was in touch with Mary and was following her care by telephone. Nurse Kelley took it upon herself to spend extra time with Mary, charting in Mary's room when Mary was oriented only to person and place in the middle of the night. See Trial Ex. 101 at 62. When Mary awakened in the midst of the night, Nurse Kelley gave her the task of folding wash cloths to keep Mary occupied during times when Nurse Kelley checked other patients. At one point during her care for Mary, Nurse Kelley observed Mary sitting at bedside, oriented to person, place, and time. Nurse Kelley instructed Mary on the use of the call light, which Mary understood.

During the day of October 20, 2009, Reindl again visited Mary. Mary reported that she was feeling better, but was continuing to have dizziness when standing up and was concerned with her balance. Trial Ex. 101 at 53. Reindl reenforced that Mary was not to get up without assistance from the nurses. Telemetry had been discontinued on October 20, and use of a bedside commode likewise was discontinued.

---

[1]Wierzbicki was close to her mother Mary, speaking with her mother regularly by phone in lengthy conversations. The Government sought to characterize Wierzbicki's relationship with Mary as distant. There was geographic distance in the relationship with Mary living in South Dakota and Wierzbicki living in California without the two seeing each other in person very often. Wierzbicki, however, was a loyal and caring daughter to Mary, such that it is unfair to characterize the relationship as a distant one.

Nurse Kelley again provided nursing care for Mary on the night of October 20 and 21. Mary was able to get out of bed with Nurse Kelley's assistance and used the walker in getting to the bathroom. Mary was better oriented than she had been the prior night. See Trial Ex. 101 at 64.

During the day shift of October 21, 2009, Nurse Monica Pochop[2] provided nursing care to Mary. Nurse Pochop was aware that Mary was on fall precautions and instructed Mary to use her call button for assistance. Mary in fact used her call button during the time Nurse Pochop was caring for her. Mary reported that she sometimes felt a little dizzy when she first sat up but then the dizziness went away. Trial Ex. 101 at 54. Mary was alert and oriented throughout Nurse Pochop's time of caring for her. Trial Ex. 101 at 54-55, 66. Nurse Pochop had no concern about Mary's understanding or mental ability and perceived no need for constant monitoring of Mary at that point.

During the day of October 21, 2009, Wanblee Guerue, the social service representative at Rosebud IHS, visited and talked with Mary for seventy-five to eighty minutes. Trial Ex. 101 at 31. During the visit, Mary was sitting up on her bed edge and was alert and oriented. Guerue spoke with Mary about Mary residing at the White River Nursing Home, which was prepared to accept her on October 26. Mary was receptive to doing so and said that her doctor had advised that she needed to be in a nursing home. Guerue recorded that Mary said, "Wanblee, I'm giving up my independence . . . [.] I don't want to go home either[.] I'm afraid cause I keep falling, I might kill myself if I keep falling." Trial Ex. 101 at 31. Mary had been a very independent person throughout her life.

### C.  Circumstances of Mary's Fall at Rosebud IHS

Nurse Westcott, who had provided nursing care on the second night that Mary was at

---

[2]Monica Pochop married and is now know as Monica Oldenkamp.

Rosebud IHS, was responsible for Mary's nursing care from the evening of October 21 until the day shift of October 22, 2009. Nurse Crystal Shields (Shields) and one other nurse worked the night shift with Nurse Westcott on the medical and surgical wing where Mary was hospitalized. Patient census data indicated that there were a total of eleven patients that night in the medical and surgical wing of Rosebud IHS. See Trial Ex. 119.

Nurse Westcott knew that Mary remained on fall precautions as a fall risk. Nurse Westcott checked on Mary on several occasions throughout the shift. At 10:30 p.m., on October 21, 2009, Nurse Westcott recorded that Mary said that she was feeling better and that she was going to take Amitriptyline, an antidepressant that apparently helped Mary sleep and has a known side effect of dizziness. See Trial Ex. 101 at 55. Nurse Westcott recorded that Mary was alert and oriented to person and place. See Trial Ex. 101 at 55. Nurse Westcott helped Mary use the bathroom, which Mary accessed using her walker with Nurse Westcott's assistance. Trial Ex. 101 at 55. Nurse Westcott recorded that Mary remained on fall precautions and was at risk of injury due to an unsteady gait. Trial Ex. 101 at 55. Nurse Westcott checked on Mary periodically thereafter, but did not remain in Mary's room.

The last charting done by Nurse Westcott before Mary's fall is at 0400—that is, 4:00 a.m.—on October 22, 2009. Trial Ex. 101 at 66-67. Nurse Westcott assessed Mary at that time and recorded Mary's vital signs. Trial Ex. 101 at 66-67. Nurse Westcott recorded that Mary was alert and oriented times three. Trial Ex. 101 at 66. Mary wanted to go to the bathroom, so Nurse Westcott helped her stand and helped her use the walker to go to the bathroom. Nurse Westcott remained in the bathroom while Mary went, helped her off of the toilet, and assisted her back into bed. Throughout this time, Mary was wearing slippers provided by Rosebud IHS with rubber grips on the bottom. Nurse Westcott left Mary in bed, with the side rails up, the bed in the lowest

position with wheels locked, and with Mary's call light within reach.   Mary remained in Room 144, with her upper torso and upper part of her bed visible from the nurses' station.   Nurse Westcott recorded that Mary was "steady with walker." Trial Ex. 101 at 66-67.

Westcott then returned to the desk to do the charting. Upon completing the charting, Nurse Westcott asked Nurse Shields to "keep an eye" on Mary for her.   Nurse Westcott then walked down the hall, through some doors, checked on certain obstetrical equipment as a courtesy to other nurses, used the bathroom, and obtained a cup of coffee.   Rosebud IHS is not a large facility and the places that Nurse Westcott visited were not far from the medical and surgical wing.   Upon returning to the medical and surgical wing, Nurse Westcott either saw Nurse Shields entering Mary's room or heard Nurse Shields in Mary's room, and then assisted Nurse Shields.

During the time Nurse Westcott was gone from the medical and surgical wing, Nurse Shields remained at the nurses' station.   Nurse Shields was not looking directly into Mary's room, which would be at approximately a two-o'clock position from the nurses' station, but heard a noise from Mary's room that she thought could have been a fall.   Nurse Shields got up, went into Mary's room, and found Mary lying on the bathroom floor.   Nurse Shields did not witness Mary's fall nor see her getting out of bed.   No call light had gone off from Mary's room, and Nurse Shields saw no call light on within Mary's room.   Nurse Shields prepared an incident report concerning the fall, but did no charting concerning Mary's care.   Nurse Shields left the employment of Rosebud IHS for a different nursing job and had a limited recollection of certain details, such as what she was doing at the nurses' station or what Nurse Westcott had instructed her to do.   Although the testimony about distances involved was less than precise, it appears that Mary's route from her bed to the area where she fell probably was about 15 to 20 feet, while the distance from the nurses' station to the area where Mary fell appears to be perhaps three or four times as far.   See Trial Exs.

9

14, 15, 20, 22, 23, 30, 31, 32, 33.

Nurse Westcott made the chart entries regarding Mary's fall. Nurse Westcott recorded the fall as occurring at 0410—that is, just ten minutes after Nurse Westcott had concluded her previous care for Mary. Trial Ex. 101 at 55. Mary was on the bathroom floor and was able to move all extremities. Trial Ex. 101 at 55. Mary said, "I thought I - I just had to go." Trial Ex. 101 at 55. Mary complained of pain in her left knee and elbow and had an abrasion on her forehead as well. Trial Ex. 101 at 55-56. Mary was conscious, talking, and making sense. The two nurses assisted Mary in getting back to her bed. Nurse Westcott contacted Dr. Benson, who was working in the emergency room and who then evaluated Mary in her room. Dr. Benson found that Mary looked normal, had normal mentation, and reported wrist and knee pain. Mary appeared to be stable to him. Dr. Benson ordered x-rays and a CT scan, and then returned to the emergency room to care for other patients. See Trial Ex. 101 at 56-57.

Mary returned to the medical surgical wing around 6:00 a.m. on October 22, 2009, after she had undergone a CT scan and x-ray. Trial Ex. 101 at 56. Nurse Westcott observed that Mary was sweating profusely and that Mary's condition was deteriorating. Trial Ex. 101 at 56. Nurse Westcott took Mary to the emergency room, where Mary then lost consciousness. Dr. Benson provided care, consulted with a neurosurgeon, intubated Mary, and arranged for her to be flown to Sanford Hospital in Sioux Falls where she could receive levels of care not available at Rosebud IHS. Mary did not regain consciousness and died at Sanford Hospital on October 23, 2009. Mary had sustained a subdural hematoma as a result of her fall, with intracranial bleeding aggravated by Mary being on a blood thinning medication. The amount of blood and bleeding within Mary's skull caused her brain to compress and ultimately resulted in her death.

Wierzbicki's initial claim to the Government and Complaint asserted that her bed rails were

left down and that there was other such nursing malfeasance. Trial Ex. 51; Doc. 1 at ¶¶ 8-9. At trial, Wierzbicki's attorney argued that the nursing records had been altered and that nursing malpractice occurred that was intentionally omitted from the records. This Court had an opportunity to observe the manner of the nurses while testifying and found all of the nurses, including Nurse Westcott, to be credible. There is some question whether Nurse Westcott could have done all that she reported—charting, checking obstetrical equipment, going to the bathroom, and getting coffee—in the ten-minute period between when she recorded her 4:00 a.m. check on Mary and when she returned to record the fall at 4:10 a.m. However, there is no evidence that nursing records were altered or that nursing malfeasance somehow was omitted from the nurses' records.

In short, Nurse Westcott had taken Mary to the bathroom and then left Mary in bed with the side rails up, wheels locked, and the call light within Mary's reach. After Nurse Westcott left, Mary evidently sat up in bed, then got to her feet and used the walker to go back to the bathroom where she then fell. Mary was alert and oriented when Nurse Westcott left her and indeed was alert and oriented even after she fell and hit her head. Meanwhile, Nurse Shields, whom Nurse Westcott told to "keep an eye" on Mary, did not take that statement literally and was at the nearby nurses station when Mary fell, arriving to assist Mary just after the fall.

**D.     Expert Testimony**

Wierzbicki's nursing expert, Jacque Hight, is a certified legal nurse consultant, a nursing care coordinator at a 40-bed hospital in South Dakota, and a nurse since 1999. Hight's principal criticism of Rosebud IHS nursing care is that the fall precautions instituted for Mary's care are universal precautions that apply to all hospitalized patients and are not sufficient for a high fall risk patient. That is, having the bed in the lowest position, the wheels locked, the side rails up, a safe

11

surrounding environment, and a call light available are standard precautions that did not take into account that Mary was a high fall risk. Hight is critical that the facility did not provide the ability to do anything more, such as employ functioning bed alarms. However, Hight stopped short of saying that functioning bed alarms must be in place for the standard of care to be met. Rather, Hight's testimony was that some additional intervention—whether bed alarms, rounding every fifteen minutes on Mary, or having a "sitter" within the room—was necessary under the standard of care.

Hight acknowledged that patients can fall without nursing negligence and with adequate precautions being undertaken. Nurse Hight also acknowledged that bed alarms can malfunction at times and can give a false positive alarm at other times. However, it remained Hight's opinion that Rosebud IHS failed to provide the appropriate standard of care to Mary under Lippincott's Nursing Procedures and standard policies. Hight characterized this claimed lack of care as a "substantial factor in producing injury."

The Government's nursing expert, Peggy Hettick, has been in nursing since 1978, but does not have a background of providing direct nursing care for patients who are at high risk of falling. Hettick conducted a very thorough review of Mary's medical records throughout her life and testified to the longstanding medical issues that Mary had. Hettick proffered an explanation of why Mary, apparently ten minutes or so after having gone to the bathroom, might feel the need to go again. Because of Mary's past medical conditions and care, including a hysterectomy, Mary may have been unable to completely empty her bladder upon going at 4:00 a.m. and felt the urge to go again shortly thereafter.

Hettick drew the standard of care from the 2009 Joint Commission Hospital National Patient Safety Goals that are:

12

1. The hospital establishes a fall reduction program.
2. The fall reduction program includes an evaluation appropriate to the patient population, settings, and services provided.
3. The fall reduction program includes interventions to reduce the patient's fall risk factors.
4. Staff receives education and training for the fall reduction program.
5. The hospital educates the patient, and their family as needed, on the fall reduction program and any individualized fall reduction strategies.
6. The hospital evaluates the fall reduction program to determine the effectiveness of the program.

Trial Ex. 110 at 4-5. Hettick opined that Rosebud IHS met this standard. Hettick's unnecessary defensiveness and combativeness on cross-examination, together with her absence of being in a position of providing care for those at high risk of falls, tends to make the Court discount her expert testimony somewhat.

Because the absence of functioning bed alarms was a central issue in the case, the Government produced a fascinating expert, Ronald Shorr, M.D. Dr. Shorr is a professor of epidemiology, with an internal medicine specialty and a geriatrics sub-specialty. Much of Dr. Shorr's career has been focused on medical research. Among the wide variety of scholarly articles authored or co-authored by Dr. Shorr is one published by the American College of Physicians in its journal Annals of Internal Medicine entitled "Effects of an Intervention to Increase Bed Alarm Use to Prevent Falls in Hospitalized Patients." Trial Ex. 115. Dr. Shorr became interested in the question of whether bed alarms were effective as a fall prevention device. Dr. Shorr received a grant from the National Institutes of Health in 2004 for the study and collected data until 2009, employing a cluster randomized study approach. Dr. Shorr concluded based on the data that increased use of bed alarms had no discernable effect on reducing the number of falls or injurious falls in patient populations. Or to put it as his 2012 article did:

13

> In summary, although our intervention to increase bed alarm use increased use in intervention nursing units, there was little evidence of an effect on fall-related events or an effect on physical restraint use in intervention compared with controlled nursing units.

Trial Ex. 115 at 698. However, Dr. Shorr allowed that "although bed alarms may yet prove useful as a part of a well-defined fall prevention program, hospitals should temper expectations that their use will provide a simple and cost-effective solution to the problem of falls." Trial Ex. 115 at 698.

There are relatively few published studies on the efficacy of bed alarms. Subsequent to Dr. Shorr's study results being published, a group from the United Kingdom, using a different methodology, corroborated Dr. Shorr's conclusion. See Trial Ex. 124. That article in the abstract for conclusions surmised that

> bed and bedside chair pressure sensors as a single intervention strategy do not reduce in-patient bedside falls, time to first bedside fall and are not cost-effective in elderly patients in acute, general medical wards in the UK.

Trial Ex. 124 at 247. That article, however, posited "[i]t is also possible that alarms may prevent some falls away from the bedside, as patients may have gone beyond the bedside area by the time nurses can respond to radio-pagers." Trial Ex. 124 at 251.

Bed alarms are designed to alert nursing staff when a patient at risk of falling has left the bed, and thus a bed alarm's purpose to reduce falls. Thus, it is somewhat curious and counterintuitive that studies indicate that use of bed alarms has no statistical correlation to reduction of patient falls. There are several possible reasons for this apparent anomaly. First, bed alarms produce many false alarms resulting in some "alarm fatigue" with hospital staff responding to so many false alarms from various medical equipment that their responses become delayed or they are in different patient rooms dealing with an alarm. Second, bed alarms do not always present an alarm in time to prevent a fall. Bed alarms customarily work based on a sensor pad on

14

or within the bed.  If the patient's weight is not on the sensor pad, such as the patient has rolled to the far side of the bed to reach for an object or has sat up, the bed alarm may sound.  Bed alarms sometimes work on a four or eight second delay, as an effort to reduce the number of "false positive" alarms from a patient simply shifting position.  Once the alarm sounds, it continues until it is shut off.  Bed alarms obviously cannot prevent falls when a patient falls immediately out of bed or within a short time of getting out of bed, such that nursing staff cannot get to the patient quickly enough.

If there is a circumstance where current bed alarm technology holds promise for preventing a fall, it is, as the UK study posited, the instance where a patient at risk of falling gets up out of bed and moves about without falling long enough for nursing staff to respond to the alarm and get to the patient.  Dr. Shorr's study and the UK study suggest that these incidents appear to be rare.  It is debatable whether Mary's fall fits into this category; she had gotten out of bed and walked perhaps fifteen feet to her bathroom using a walker before she fell.

## II.      Conclusions of Law

### A.      Choice of Law

Wierzbicki brings this negligence action under the FTCA, 28 U.S.C. § 1346.  The FTCA waives the Government's sovereign immunity protection and gives federal district courts jurisdiction over FTCA suits for claims ·

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

When, as here, the FTCA action arises at an Indian Health Services facility within the

15

territory of an American Indian Reservation, the substantive law of the state in which the reservation is located applies. See LaFromboise v. Leavitt, 439 F.3d 792, 796 (8th Cir. 2006). Because Rosebud IHS is located within South Dakota, the substantive law of the state of South Dakota governs this action.

**B.      Standard of Care for Nursing Malpractice in South Dakota**

In South Dakota, the "standard of care to which a hospital must comply is to provide that care which is available at hospitals within the same or similar communities." Wuest ex rel. Carver v. McKennan Hosp., 619 N.W.2d 682, 689 (S.D. 2000) (citing Shamburger v. Behrens, 418 N.W.2d 299, 306 (S.D. 1988)); see also Koeniguer v. Eckrich, 422 N.W.2d 600, 602 (S.D. 1988) (noting that the standard of care hospitals are measured against is the care available in same or similar communities). In malpractice actions against hospitals based on the negligence of the nursing staff, such as Wierzbicki's claim, the relevant inquiry is whether the nurses provided reasonable care and exercised professional judgment under the circumstances. Koeniguer, 422 N.W.2d at 602. Individual internal hospital policies are not determinative of the standard of care required. Wuest, 619 N.W.2d at 689. Under South Dakota law, the standard of care typically must be established through expert testimony. Koeniguer, 422 N.W.2d at 601.

Some of Wierzbicki's claims of breach of the nursing standard of care—such as that the nurses left Mary on the toilet, failed to respond to her call light, left her bed rails down, and falsified nursing records—have no support in the evidence. For this Court to accept any of those proffered arguments for breach of the standard of care, this Court would have to surmise that one or more Rosebud IHS nurses perjured themselves during the trial. In evaluating the credibility of a witness, a court considers

> the witness's intelligence, the opportunity the witness had to have
> seen or heard the things testified about, the witness's memory, any

16

> motives that witness may have for testifying a certain way, the
> manner of the witness while testifying, whether that witness said
> something different at an earlier time, the general reasonableness
> of the testimony, and the extent to which the testimony is
> consistent with any [other] evidence . . . .

United States v. Moore, 978 F.2d 1029, 1032 (8th Cir. 1992); see also United States v. J.D.P., 909

F. Supp. 2d 1136, 1144 (D.S.D. 2012). Having evaluated the credibility of the witnesses under

this standard, this Court concludes that no witness at trial committed perjury or knowingly testified

falsely.

Wierzbicki's best argument for breach of the standard of care is that Rosebud IHS did not

do enough by way of fall precautions in its care for Mary. Rosebud IHS took the standard

precautions, such as having Mary's hospital bed in the lowest position, the wheels of the bed

locked, the side rails up, and the call button within Mary's reach with Mary instructed on use of

the call light. The only additional precautions that Rosebud IHS undertook were ensuring that all

nurses were cognizant of Mary being a fall risk and placing Mary in Room 144, which was near

to the nurses' station and was one of the two rooms the hospital bed can be seen from the nurses'

station. The Rosebud IHS nursing staff did not have the benefit of functioning bed alarms, and the

only other options for increased fall precautions available to the nursing staff were using a "sitter"

(which was not ordered by the physician or was not necessary for Mary's care) or more frequent

checks on Mary. Under the circumstances, it is a close call on whether Rosebud IHS—by not

having functioning bed alarms and not checking on Mary more frequently—breached the standard

of care. Ultimately, Wierzbicki bears the burden of proof that the standard of care was breached,

and this Court concludes that Wierzbicki has not sustained that burden of proof.

**C.     Causation**

Wierzbicki's claim fails for another reason as well. Wierzbicki has the burden of proof by

a preponderance of the evidence under South Dakota law that any breach of the standard of care was a cause or proximate cause of Mary's injury. Hertz Motel v. Ross Signs, 698 N.W.2d 532, 535 (S.D. 2005). A legal or proximate cause under South Dakota law means a cause which, in the natural and probable sequence, produces the injury complained of. Id. at 537; see also Estate of Gaspar v. Vogt, Brown & Merry, 670 N.W.2d 918, 921 (S.D. 2003); Zarecky v. Thompson, 634 N.W.2d 311, 316 (S.D. 2001). For a legal or proximate cause to exist under South Dakota law, the harm suffered must be a foreseeable consequence of the act complained of. Zarecky, 634 N.W.2d at 316. In other words, liability cannot be based on mere speculative possibilities or circumstances and conditions remotely connected to the events leading up to an injury. The defendant's conduct must have such an effect in producing the harm as to lead reasonable people to regard it as a cause of the plaintiff's injury. See Estate of Gaspar, 670 N.W.2d at 921; Zarecky, 634 N.W.2d at 316; Wuest, 619 N.W.2d at 689. The legal cause need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it causes the injury. However, for the legal cause to exist, it must be a "substantial factor in bringing about the harm." Zarecky, 634 N.W.2d at 316 (internal quotation marks, citation, and emphasis omitted); see also Shippen v. Parrott, 553 N.W.2d 503, 508 (S.D. 1996) (citing Therkildsen v. Fisher Beverage, 545 N.W.2d 834, 837 (S.D. 1996)).

In light of the studies suggesting that bed alarm use does not result in a reduction of falls, it is difficult to presume that the absence of a functioning bed alarm was the legal or proximate cause of Mary's fall. This Court is left to engage in a certain amount of speculation about whether a four-second or eight-second delay may have been used with respect to a bed alarm that might exist at Rosebud IHS and about whether Nurse Shields at the nurses' station could have responded quickly enough had a bed alarm sounded to intercept Mary before she fell in the bathroom.

Likewise, this Court cannot conclude by a preponderance of the evidence that more frequent checks on Mary would have prevented the fall. After all, Nurse Westcott had checked on Mary shortly before—ten minutes before the fall if the times recorded in her notes are taken as accurate—and had left Mary at a time when Mary was alert and oriented to person, place, and time, was in bed, had the side rails up, and had the call light switch within reach. Thus, Wierzbicki has not sustained her burden of proof on causation.

### D.    Affirmative Defenses

Even if Wierzbicki had shown that Rosebud IHS breached the standard of care and that breach was a direct cause of Mary's fall, Wierzbicki's claim has another obstacle in the Government's affirmative defense of contributory negligence. Under South Dakota law, "[c]ontributory negligence is negligence on the part of a plaintiff which, when combined with the negligence of a defendant, contributes as a legal cause in the bringing about of the injury to the plaintiff." Klutman v. Sioux Falls Storm, 769 N.W.2d 440, 450 (S.D. 2009) (quoting Steffen v. Schwan's Sales Enters., Inc., 713 N.W.2d 614, 619 (S.D. 2006)). Contributory negligence can be an affirmative defense in a professional negligence action. See Dodson v. S.D. Dep't of Human Servs., 703 N.W.2d 353, 355 (S.D. 2005). South Dakota law is unique in that contributory negligence bars recovery if that contributory negligence is "more than slight" in comparison to the negligence of the defendant. Wood v. City of Crooks, 559 N.W.2d 558, 560 (S.D. 1997). If a plaintiff's contributory negligence is less than slight or only slight in comparison with the negligence of the defendant, that plaintiff may still recover damages under South Dakota law. S.D. Codified Laws § 20-9-2; see also Owen v. United States, 645 F. Supp. 2d 806, 827 (D.S.D. 2009). Because contributory negligence is an affirmative defense, the Government bears the burden of proof by a preponderance of the evidence on the issue. Johnson v. Armfield, 672 N.W.2d 478, 481

19

(S.D. 2003).

To be clear, Mary did nothing inherently wrong in getting up on her own to go to the bathroom. However, Mary knew that she was at risk of falling, and had voiced her knowledge of that risk on multiple prior occasions to Rosebud IHS staff. Mary had been instructed on multiple occasions to use her call light if and when she needed assistance. Mary knew that nurses were on staff to help her. Having been in the hospital for four days, Mary would have known that the way of getting assistance from nursing staff was the use of the call light, which she had used in the past, rather than expecting a bed alarm to sound or expecting nursing staff to actually be in the room with her or have eyes on her at all times.

Wierzbicki at trial argued that Mary was disoriented when she got up and her mental state was such that she cannot be deemed responsible for that choice. Mary did have occasions when she was not oriented times three (that is, oriented to person, place, and time) and had taken Amitriptyline, a medication that can cause dizziness and confusion. However, Mary was oriented times three when Nnurse Westcott had last checked on her, Mary was coherent when found on the floor to the point of indicating where she hurt and explaining that she had gotten up because she just felt that she had to go, and Mary demonstrated normal mentation to Dr. Benson when he later arrived to check on her in her room. Thus, the evidence indicates that Mary was not confused and disoriented at the time she fell, although she probably did become dizzy causing the fall. Prior to the point where the intracranial bleeding affected her functioning and consciousness, Mary at no point blamed the nursing staff for her fall, but simply proffered an explanation that she just felt that she had to go.

This Court is not implying that Mary is responsible for her own death. Accidents happen, even in hospital settings, without any party deserving blame. However, even if it could be said that

20

Rosebud IHS was somewhat negligent for not having functioning bed alarms or checking on Mary more frequently, the contributory negligence of Mary is greater than slight in comparison to the claimed negligence of Rosebud IHS.  Therefore, Mary, and in turn Wierzbicki, is barred by the doctrine of contributory negligence under South Dakota law from recovery here.

### III.   Conclusion

For the reasons explained above, it is hereby

ORDERED that judgment for the Defendant will enter on Plaintiff's Complaint.

Dated July 15th, 2014.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE